IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| NATURAL IMMUNOGENICS CORP., a Florida corporation,<br><br>          Plaintiff,<br><br>   v.<br><br>NEWPORT TRIAL GROUP, a California Corporation; SCOTT J. FERRELL, a Texas resident; RYAN M. FERRELL, an Arizona resident; JAMES B. HARDIN, a California resident; VICTORIA C. KNOWLES, a California resident; ANDREW LEE BASLOW, a California resident; ANDREW NILON, a California resident; SAM PFLEG, a California resident; MATTHEW DRONKERS, a California resident; TAYLOR DEMULDER, a Nevada resident; SAM SCHOONOVER, a California resident; GIOVANNI SANDOVAL, an Arizona resident; and DOES 1-10, inclusive,<br><br>          Defendants. | Case No. _____<br><br>C.D. CAL. No. 8:15-cv-02034-JVS<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS**<br><br><br>*CONCURRENTLY FILED WITH MOTION TO TRANSFER THE INSTANT MOTION* |

## MEMORANDUM

## FACTUAL BACKGROUND

### A.    Mr. Negrete Is A Critical Witness In The Pending Litigation.

On December 7, 2015, Plaintiff Natural Immunogenics Corp. ("NIC"), a

Florida corporation, filed a lawsuit in the United States District Court, Central

District of California, against the NTG Defendants and Non-NTG Defendants.

(Exh. 1, attached to the concurrently-filed Declaration of Stephanie A. Sperber ("Sperber Decl.")[1].)  On May 10, 2016, NIC filed its Second Amended Complaint, asserting claims for malicious prosecution, violation of RICO, conspiracy to violate RICO, and violation of California's Unfair Competition Law. (*See* Exh. 2.)

NIC's claims in the Pending Litigation stem from a consumer class action lawsuit that was filed against NIC in California, *Nilon v. Natural-Immunogenics Corp*. ("the Underlying Litigation").  (*See* Exh. 3 at ¶¶ 13-14.)  In the Underlying Litigation, the NTG Defendants represented Plaintiff Andrew Nilon while Carlos Negrete, a California attorney at the time, represented Defendant NIC.  (Exhs. 3 and 4.)

Although Carlos Negrete represented NIC in the Underlying Litigation for nearly three years (from April 2012 to February 2015), he failed to properly defend NIC in that lawsuit.  As a result, in February 2015, NIC replaced Mr. Negrete with the law firm of Emord & Associates ("Emord").  (Exh. 4.)  Three months after Emord replaced Mr. Negrete, the Underlying Litigation was dismissed.  (Exh. 5.)

In the pending malicious prosecution claim that NIC has filed against the NTG Defendants, NIC is seeking to recover nearly $200,000 for the attorney's fees it paid to Emord.  (Sperber Decl. at ¶ 8.)  A critical issue in the Pending Litigation is whether NIC's damages are due to Mr. Negrete's negligence and malpractice.  In

---

[1] All exhibits are attached to the concurrently-filed Declaration of Stephanie A. Sperber and referenced in the Request for Judicial Notice to the extent they constitute public filings.

numerous filings with the Court in the Underlying Litigation, NIC made the following claims:

- "[NIC] sought substitution of counsel, in part, because its prior counsel, Carlos Negrete, had stopped providing substantive updates and important case information." (Exh. 6 at 2:6-8)

- "Despite repeated efforts to reach Mr. Negrete for status conferences, [NIC's] messages went unanswered, at times for periods of more than 30 days." (*Id*. at 2:8-10.)

- "Given the lack of communication [from Mr. Negrete], demonstrated through email records, [NIC] was unaware that discovery deadlines had passed or would pass without action by its counsel." (*Id*. at 2:10-12.)

- [NIC] learned in December 2014 that Mr. Negrete had failed to take the deposition of Plaintiff [].  [NIC] had stressed the need for that deposition, and the failure to take the plaintiff's deposition raised significant concerns." (*Id*. at 14: 22-25.)

- "[NIC] has discovered that its prior counsel either failed to perform discovery or deliberately avoided discovery essential to [NIC's] defense." (Exh. 7 at 8:18-20.)

- "For a three-year case, the limited record thus far is disturbingly light on material produced." (*Id*. at 11:8-9.)

Shortly after Mr. Negrete was removed from the Underlying Litigation, he abandoned his law practice in California.  (Exh. 8 at 4:10-11.)  Mr. Negrete's decision to abandon his law practice was discovered because numerous clients and at least one judge reported his absence to the California State Bar.  (*Id.* at 5:3-6:12.)  As a result of the California State Bar's investigation, it was discovered that Mr. Negrete had fled to South Carolina.  (*Id*. at 18:17-26:5 (Declaration of Thomas T. Tran, Investigator by the Office of the Chief Trial Counsel of the State Bar of California).)  In response to the California State Bar's investigation, Mr. Negrete claimed that he had a medical condition that had forced him to abandon his law practice.  (*Id*. at 25:23-25.)  In consideration of his medical condition and that Mr. Negrete made clear that he would no longer be attempting to practice law, the California State Bar did not pursue disbarment, but instead changed his status to "involuntary enrolled as an inactive member."  (*See id*. at 25:23-27:3; *see also* Exh. 9.)

Because Mr. Negrete's representation of NIC and handling of the Underlying Litigation are critical issues to the malicious prosecution claim, which is the predicate for the RICO claims, NTG served Mr. Negrete with a subpoena for documents and a subpoena to appear for deposition.

**B.**   **NTG Served Mr. Negrete With Two Subpoenas Requiring Compliance In South Carolina, But Agreed To Move Compliance To North Carolina At Mr. Negrete's Request.**

On June 13, 2017, NTG served Mr. Negrete with two subpoenas.  (Sperber Decl. at ¶ 5.)  The first was a Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises in a Civil Action (the "Document Subpoena"). (Exh. 10.)  The second was a Subpoena to Testify at a Deposition in a Civil Action (the "Deposition Subpoena").  (Exh. 11.)  The Document Subpoena required Mr. Negrete to produce documents by June 23, 2017, at AWR Court Reporting, 33 Market Point Drive, Greenville, South Carolina, 29607.  (*See* Exh. 10.)  The Deposition Subpoena required Mr. Negrete to appear at the same location on June 29, 2017, at 10:00 a.m.  (*See* Exh. 11.)  The purpose of serving Mr. Negrete with a Document Subpoena separate from his Deposition Subpoena was to ensure NTG received the documents before his deposition.  (Exh. 12.)  Although Mr. Negrete was served at his home in North Carolina, the place for compliance was set for Greenville, South Carolina, because it has a major airport and still complies with the 100-mile rule in Federal Rule of Civil Procedure 45(c).  (Exh. 13.)

On June 23, 2017, NTG's counsel sent Mr. Negrete a letter to request production of documents and to confirm his appearance on June 29, 2017.  (Exh. 14.)  In response, Mr. Negrete requested that the deposition be moved to Asheville, North Carolina and stated that he had no documents other than possibly billing records. (Exh. 12.)  Per Mr. Negrete's request, NTG agreed to move the deposition to Asheville, North Carolina.  (*Id*.)  On June 26, 2017, NTG served Mr. Negrete

with a new Deposition Subpoena, set for June 29, 2017, in Asheville, North Carolina. (Exh. 15.) On that same date, NTG's counsel followed up with Mr. Negrete regarding compliance with the Document Subpoena. (Exh. 16.) Specifically, NTG's counsel pointed out to Mr. Negrete that the Document Subpoena included a requirement "to produce email communications." (*Id.*) Mr. Negrete responded that "there are no such documents in [his] possession. . . . My memory has been challenged lately due to my medical condition. My old email accounts were abandoned and some were shut down completely." (Exh. 17.) Mr. Negrete then stated, "you can ask me all of this at the deposition and I will be forthright in my testimony. I will also continuing [*sic*] with my search of anything that is responsive to your request and will continue to do so until the time of the deposition." (*Id.*)

On June 27, 2017, because the parties were anticipating Court rulings regarding various attorney-client privilege and work product issues that could have implicated the scope of Mr. Negrete's deposition, NTG took Mr. Negrete's deposition off calendar pending those rulings. (Exh. 18.)

On October 6, 2017, NTG served Mr. Negrete with a new Deposition Subpoena compelling him to appear for deposition on October 25, 2017, in Asheville, North Carolina. (Exh 19.) Realizing that the process server forgot to provide Mr. Negrete with witness fees, NTG re-served the Deposition Subpoena

with witness fees on October 18, 2017.  (Exh. 20.)  On October 25, 2017, Mr.

Negrete appeared for his deposition in Asheville, North Carolina.  (Exh. 21.)

**C.**    **At Deposition, Mr. Negrete Disclosed That He Failed (And Refused) To Conduct a Search For Documents.**

On October 25, 2017, and pursuant to Mr. Negrete's request on June 26, 2017, NTG asked Mr. Negrete about the document requests contained in the Document Subpoena.  (*See* Exh. 17.)  At his deposition, Mr. Negrete confirmed that he used a Hotmail email address for his email communications during the period he was representing NIC.  (Exh. 21 at 85:10-14, 191:16-19, 251:4-6.) However, it became clear that Mr. Negrete had failed to search his Hotmail email account for responsive documents, claiming medical reasons for his failure to search:

Q:  Mr. Negrete, what happened to the Hotmail account?

A:  I don't like to look at it.

Q:  Why is that?

A:  For reasons associated with my medical condition.

Q:  Mr. Negrete, do you still have access to that Hotmail account?

A:  Not sure.

Q:  Have you attempted to open that account to see what's in there in terms of emails.

A:  I could have.

    *    *    *

Q:  But have you is my question.

A:  No specific time comes – no specific event comes to mind, but it could have.

Q:  In response to this subpoena, did you lock – log into that Hotmail account to look for communications between yourself and Clark Baker?[2]

A.  I wouldn't have -- I wouldn't have had to.

Q.  You wouldn't have had to?

A.  Correct.

Q.  Why not?

A.  I don't believe there is any.

Q.  But you didn't look?

A.  No.

Q.  Why not?

A.   I just told you.  It's not something I'm comfortable with and it would be fruitless if I knew I didn't have any communications.

(*Id.* at 86:5-87:12; *see also id*. at 87:15-16 ("why search for something that's unpleasant when I don't have to").)  In fact, in response to questions specific to the various document requests, Mr. Negrete repeatedly confirmed that he had conducted no search at all:

Q.  Mr. Negrete, turning to request for production number 4, it asks for all documents that reflect, refer or relate to your plans to take the deposition of Andrew Nilon on February 7, 2014.  Do you see that?

A:  Yes, I – yes, I see that, I see the request.

_____

[2]  The Document Subpoena, Request for Production No. 1, requested communications with Clark Baker.  (Exh. 10.)

8

Q:  Did you search for documents that would have – that would be responsive to this request?

A:  No.

    *   *   *

Q:  Mr. Negrete, with regard to request for production number 8, did you do any searches to see if you had documents related to NIC's ex parte application to modify the Rule 16(b) scheduling order?

A:  No.

Q:  Did you check your Hotmail account?

A:  No.

Q:  And is that for the same reasons that we discussed related to the Hotmail account?

A:  Yeah, and the documents, yes.

(*Id.* At 90:19-91:3, 99:15-25; *see also id*. At 84:14-18, 85:1-9, 88:3-89:6, 100:6-106:22, 107:9-110:22.)

As set forth below, Mr. Negrete was required to search for responsive documents.  Accordingly, the Court should grant NTG's motion to compel.

**D.**   **At Deposition, Mr. Negrete Refused To Respond To Questions, Asserted Improper Objections, Was Evasive And Argumentative.**

From the beginning of the deposition, Mr. Negrete made clear that his testimony would be impacted by his medical condition and the medications he is currently taking.  (*Id*. at 8:10-12, 65:10-66:13.)  Specifically, Mr. Negrete testified that his medication and medical condition "may affect [his] testimony" and "could affect [his] memory, either short term or long term."  (*Id*. at 13:5-10, 7:22-25; *see*

9

*also id.* at 28:22-29:10, 37:3-13, 43:3-12, 54:12-55:9, 57:6-19, 65:10-66:13, 157:16-20, 211:23-212:18.)  In fact, Mr. Negrete admitted that his testimony "may not be accurate because of the medical care" he was currently undergoing.  (*Id.* At 124:21-125:9.)   Notwithstanding the fact that his medications and medical condition apparently had a dramatic impact on the quality, accuracy and veracity of his testimony, Mr. Negrete refused to provide information regarding his medical condition and medications.  (*See*, *e.g., id.* at 8:10-2, 13:25-14:23, 65:10-66:13.)

Second, Mr. Negrete refused to respond to questions regarding conversations he had with Emord in anticipation of his deposition on October 29, 2017.  (*Id.* at 22:20-23:19.)

Third, Mr. Negrete was intentionally evasive when responding to questions regarding prior lawsuits that had been filed against him:

Q:  Do you recognize this as a complaint for legal malpractice that was filed in California state court?

A:  Yeah, this is a dismissed complaint.

\*   \*   \*

Q:  Do you recall what the basis of this legal malpractice lawsuit was?

A:  Well, the complaint speaks for itself.  I'm not here to testify as to an opinion.

\*   \*   \*

Q:  What was the basis?

A:  Soundless.

(*Id.* at 32:3-34:8; *see also id*. at 31:21-46:9, 52:10-25, 53:8-57:19, 66:14-69:13, 71:18-72:8.)

Fourth, Mr. Negrete refused to respond to questions regarding documents based on his objection that the document "speaks for itself."  (*See, e.g., id.* at 33:22-25, 34:12-15, 80:2-9, 81:7-83:3, 166:16-24, 169:18-170:7, 197:25-198:4.)

Fifth, Mr. Negrete was often purposely and unnecessarily argumentative in response to questions.  (*See, e.g., id*. At 139:20-140:20, 145:17-146:11, 148:7-149:12, 174:8-176:6.)  For example, upon being shown the original complaint in the *Nilon* matter, Mr. Negrete testified as follows:

> Q:  Do you recognize this as the complaint that was filed against [NIC] by Andrew Nilon?
>
> A:  You know, having a little difficulty, maybe you can help me out. Is Andrew Nilon the fake client, is he the fake guy?  I'm trying to get this straight.  There was somebody else that came in later and I know Andrew Nilon, I think, was the fraud, but I'm not quite sure.  If it's his or if the – the original complaint, then it's probably the guy.  When I say original complaint, the original complaint by Newport Trial Group.
>
> Q:  Mr. Negrete, do you recognize this as the original complaint that was filed against [NIC]?
>
> A:  Okay. My recollection and my memory of this is there were an -- there was an action brought originally by a guy turned out to be a phony.  I believe that's Natural -- Andrew Nilon. If that's the one that started the cases with Newport Trial Group, then, yes, I believe this is the one.

(*Id.* at 139:20-140:20.)  Further, when questioned regarding an email sent by his office, Mr. Negrete responded as follows:

Q:   And this email is requesting dates for the depositions of Dr. Willis and the Plaintiff?

A:   Now is the Plaintiff the phony guy or the guy that they substituted in?  I don't know who that is.  There's one there was a phony and I'm trying to remember, I think ultimately became Sandoval.  I'm not sure -- well, Nilon, so let's look at the dates.

Q:   Move to strike.  Mr. Negrete, my question was does this email request dates for the depositions of Dr. Willis and the Plaintiff?

A:   Oppose your motion to strike.  I'm trying to refresh my recollection and I asked you a legitimate question.  I don't know whether this is Nilon or Sandoval; one was a phony.  I think it was Nilon just because the dates – we got -- well, you got 4/10 and this is --

(*Id.* at 148:7-23.)

As set forth below, Mr. Negrete was required to provide responsive, non-evasive, non-argumentative answers to the deposition questions.  Accordingly, the Court should grant NTG's motion to compel.

## **PROCEDURAL BACKGROUND**

Currently, fact discovery is scheduled to close on December 31, 2017, although NIC has made a request that it remain open until March 2, 2018.  (Exh. 22.)  Assuming the December 31, 2017 discovery cut-off remains unchanged, the parties are required to file all discovery motions by January 10, 2018.  (Exh. 23.)  Accordingly, this motion is timely pursuant to the scheduling order set by the Court in the Pending Litigation.

Following Mr. Negrete's October 25, 2017 deposition, there were issues whereby Mr. Negrete did not promptly receive a copy of the deposition transcript

to review.  (Exh. 24.)  Accordingly, on December 15, 2017, NTG's counsel sent Mr. Negrete a complete, hard copy of the deposition transcript for his review, and extended the date for him to make corrections to January 15, 2018.  (*Id.*)

On December 29, 2017, although not required pursuant to this Court's Local Rule 7.1(B), NTG's counsel sent Mr. Negrete a meet-and-confer letter.  (Exh. 25.) In that letter, NTG addressed the fact that it would be seeking an order to compel documents responsive to Document Request Nos. 1-4 and 7-13.  (*Id.* at 2; *see also* Exh. 16.)  NTG further indicated that, in light of Mr. Negrete's apparent medical reasons for refusing to search his Hotmail email address, NTG would specifically request an order that either (1) requires Mr. Negrete to provide a third-party computer expert with the log-in credentials to his Hotmail email account to conduct searches for documents responsive to Document Request Nos. 1-4 and 7-13; or (2) requires Mr. Negrete to conduct the same searches that would be conducted by the third-party expert and provide responsive documents or certify that he had complied with the search requirements and no such documents exist. (*Id.*)

In addition, NTG addressed the problems regarding Mr. Negrete's refusal to respond to questions at deposition and other conduct, discussed above.  (*Id.* at 2-3.) In an effort to resolve the issues without a discovery motion, NTG asked Mr. Negrete to (1) agree to a second deposition for three hours (presumably in the same location); (2) agree to respond to questions related to his medical condition and

medications; and (3) agree that the Special Master assigned to the Pending Litigation be allowed to appear telephonically at the deposition to rule on any objections that may be raised.  (*Id*. at 3.)

On January 5, 2018, Mr. Negrete, NTG's counsel and NIC's counsel participated in a meet-and-confer call.  (Sperber Decl. at ¶ 3.)  During that call, NTG's counsel confirmed that NTG was only seeking documents in Mr. Negrete's Hotmail email account.  (*Id*.)  Mr. Negrete initially suggested that he could not access those emails because they were associated with a Microsoft Outlook program, but then acknowledged that he did not need the Outlook program to log into Hotmail.  (*Id*.)  During that call, Mr. Negrete indicated that NTG Defendants were "free to issue a subpoena to Hotmail."  (*Id*.)  NTG's counsel explained that such a subpoena would be improper without his consent (referring to the Stored Communications Act, 18 U.S.C. §§2701-2712), and asked Mr. Negrete if he would consent to such a subpoena.  (*Id*.)  Mr. Negrete refused to consent.  (*Id*.)

With respect to his deposition testimony, Mr. Negrete refused NTG's requests laid out in the December 29, 2017 letter.  (*Id.* at ¶ 4.)  He further refused NTG's request to have the discovery disputes transferred to the Central District of California so they may be resolved by the Special Master assigned to the Pending Litigation.  (*Id*.)  Mr. Negrete explained that he would not consent to transfer the discovery motions because it would be a burden for him to appear in California.  (*Id*.) NTG's counsel explained to Mr. Negrete that the Special Master conducts all

hearings telephonically so there would not be any need for him to travel.  (*Id.*; *see also* Exh. 26  at 3:13-15.)  Mr. Negrete refused to consent.  (Sperber Decl. at ¶ 4.*)*

## ARGUMENT

A.   **Because Mr. Negrete Failed To Search For Responsive Documents And Is Apparently Unable To Do So Due To His Medical Issues, The Court Should Allow A Neutral Computer Expert To Conduct Narrow Searches For Responsive Documents.**

Pursuant to Federal Rule of Civil Procedure 34, Mr. Negrete is required "to produce documents and tangible things or to permit an inspection" as a result of the Document Subpoena that was served on him pursuant to Federal Rule of Civil Procedure 45.  Non-parties are generally subject to the same obligations as parties with regard to discovery requests made pursuant to litigation.  *See Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 636 (C.D. Cal. Dec. 7, 2005).  As a result, nonparties (like parties) are obligated to search for and produce documents and electronically-stored information in their "possession, custody or control."  *See Poole v. Textron, Inc.* 192 F.R.D. 494, 501 (D. Md. Mar. 30, 2000) (requiring production of documents "even though [the person] may not actually possess the documents").  "It is well established that 'control,' which is defined not as possession, but as the legal right to obtain documents on demand, is the test as to whether the production is required."  *Alexander v. FBI*, 194 F.R.D. 299, 301 (D.D.C. 2000) (citing *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984)).  "[S]o long as the party has the legal right or ability to obtain the documents from another source upon demand,

that party is deemed to have control." *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d. Cir. 2004).

Mr. Negrete testified that he simply did not look in his Hotmail email account because of his health. (Exh. 21. at 86:24-87:12, 103:13-17.) Here, Mr. Negrete is the *only* person who has control and access to the documents in his Hotmail email account. Mr. Negrete's failure to search the account for any responsive emails is an abdication of his obligations pursuant to the Document Subpoena and Federal Rules of Civil Procedure. Further, NTG's request is not a fishing expedition as it has evidence that the Hotmail email account contains communications that are responsive to its requests. (Exhs. 27 and 28.) However, NTG is not insensitive to the fact that Mr. Negrete claims that the Hotmail email account is a "trigger" for his condition. [Sperber Decl. at ¶ 3; *see also* Exh. 21 at 86:5-87:16, 99:15-25.) For that reason, NTG has suggested that a third-party, neutral computer expert could be hired to conduct narrow searches for documents responsive to the Document Subpoena. (Exh. 25.) Conducting such narrow searches should alleviate Mr. Negrete's concern regarding disclosure of privileged information related to other former clients. To the extent the search locates documents related to NIC, the parties could (and likely would) seek the Central District's ruling on the admissibility of those documents.

A forensic examination of Mr. Negrete's Hotmail email account is authorized by statute. Federal Rule of Civil Procedure 34(a) expressly allows "the

requesting party . . . to inspect, copy, test, or sample . . . electronically stored information." Fed. R. Civ. Pro. 34(a)(1)(A).  Courts routinely compel production and inspection of computer hard drives where electronic evidence is involved, where a response to a discovery request contains discrepancies or inconsistencies, or where the responding party has failed to produce responsive information.  *See, e.g., John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) ("[F]orensic imaging [of a hard drive] is not uncommon in the course of civil discovery.").  Here, there is evidence that responsive documents exist in the Hotmail email account, thus warranting NTG's request.  *See Ameriwood Indus. Inc. v. Liberman*, 2006 U.S. Dist. LEXIS 93380, at *1 (E.D. Mo. Dec. 27, 2006) (ordering hard drive imaging because the court had "cause to question whether defendants have produced all responsive documents"); *see also Balboa Threadworks, Inc. v. Stucky*, 2006 U.S. Dist. LEXIS 29265, at *12 (D. Kan. Mar. 24, 2006) (permitting hard-drive imaging where representation that no responsive materials existed on computer was contradicted by evidence).  Alternatively, Mr. Negrete should be compelled to conduct the same searches that would be conducted by the third-party expert and provide responsive documents or certify that he had complied with the search requirements and no such documents exist.  (*Id*.)

**B.**     **Because Mr. Negrete Refused To Respond To Deposition Questions,
Was Evasive and Argumentative, The Court Should Compel Mr.
Negrete To Provide Further Deposition Testimony.**

Pursuant to FRCP 30, depositions of third-party witnesses are an authorized
method of obtaining discovery.  A deposition proceeds as though the testimony
were being given at trial except Federal Rules of Evidence 103 and 615 do not
apply.  *See* Fed. R. Civ. Pro. 30(c)(1).  To the extent an objection is stated, "the
examination still proceeds; the testimony is taken subject to any objection."  Fed.
R. Civ. Pro. 30(c)(2).

It is well established that a party may obtain discovery regarding any
nonprivileged matter that is relevant to any claim or defense and proportional to
the needs of the case.  *See* Fed. R. Civ. Pro. 26(b)(1).  Relevance is not defined by
admissibility at trial, but rather is "construed broadly to encompass any matter that
bears on, or that reasonably could lead to other matters that could bear on, any
issue that is or may be in the case."  *Folz v. Union Pac. R.R.*, 2014 U.S. Dist.
LEXIS 85960, at *3 (S.D. Cal. June 23, 2014) (quoting *Oppenheimer Fund, Inc. v.
Sanders*, 437 U.S. 340, 350-51 (1978)).  "The party who resists discovery has the
burden to show discovery should not be allowed, and has the burden of clarifying,
explaining and supporting its objections."  *Doe v. City of San Diego*, 2013 U.S.
Dist. LEXIS 179077, at *16 (S.D. Cal. Dec. 13, 2013) (quoting *Keith H. v. Long
Beach Unified Sch. Dist.*, 228 F.R.D. 652, 655-56 (C.D. Cal. 2005)).

Rule 37 of the Federal Rules of Civil Procedure provides that a party may move for an order to compel an answer if "a deponent fails to answer a question asked under Rule 30." Fed. R. Civ. Pro. 37(a)(3)(B)(i). An "evasive or incomplete . . . answer . . . must be treated as a failure to . . . answer." Fed. R. Civ. Pro. 37(a)(4); *see also Westmoreland v. CBS*, 770 F.2d 1168, 1175, (D.D.C. 1985). "The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable." *Murillo Modular Grp., Ltd. v. Sullivan*, 2016 U.S. Dist. LEXIS 145308, at \*9 (N.D. Tx. Oct. 20, 2016) (citing *McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990).

### 1.    *Mr. Negrete Must Disclose His Medical Condition And Medications Because He Has Put Them At Issue.*

"Information relevant to a party's or likely witness's credibility may fall within Rule 26(b)(1)'s scope." *Murillo Modular Grp., Ltd.*, 2016 U.S. Dist. LEXIS 145308, at \*26 (citing Fed. R. Civ. Pro. 26, Advisory Comm. Note for 2015). At multiple points during the deposition, Mr. Negrete claimed that his medical condition and medications affected both his memory and testimony at the deposition, and may have affected his practice in or around 2013 and 2014. (*See e.g.* Exh. 21. at 14:18-23; 56:6-12.) However, at other times, Mr. Negrete claimed to have vivid memories of certain interactions with the NTG Defendants, despite being unable to provide any specificity regarding those "vivid" memories other

than to attack the character of the NTG Defendants.[3]

In *Dorato v. Smith*, 163 F.Supp.3d 837, 885 (D.N.M. 2015), the Court held that a police officer's psychological records were relevant because the officer's medical condition could have affected his credibility.  The *Dorato* Court further noted that the witness waived the psychotherapist-patient privilege because he had no reasonable expectation that the communication would remain private in that he disclosed his medical condition to the City of Albuquerque, the Albuquerque police department and others.  *Id.* at 887.  Although medical information is protected by various state and federal privileges, those protections are not absolute. "[A] person possesses no reasonable expectation that his medical history will remain *completely* confidential."  *In re Zuniga*, 714 F.2d 632, 641 (6th Cir. 1983) (emphasis in original) (citing *Whalen v. Roe*, 429 U.S. 589, 606-607 (1977)).

---

[3] A:  . . . So I have vivid memories of meeting with Ryan and Victoria Knowles on the Linon (sic) deposition.  I believe it was before the April date, but I -- I'm pretty sure in the drafting of this declaration, they wanted to be precise, when I say they, Jennifer, wanted to be precise and have documentation. So she's referring to her email.
Q:  You have vivid memories regarding meeting with Ryan and Victoria Knowles. Please tell me about those memories.
A:  Well, we met at times. I'm not saying during that time period or before, but I've met with Ryan many times. I've met with Victoria many times.
Q:  Please tell me about those vivid memories.  What exactly was the discussion when you met, where did you meet?
A:  I met one time, I believe, at my office with Ryan.  . . .  The memory of the meeting is he was being obstructive, obnoxious and lying. With Victoria, she's a much nicer person, somewhat more professional, equally a liar. Both of them were being dilatory, evasive and specious as to discovery. That's what I remember. Victoria I might have met maybe twice, once or twice.
(Exh. 21 at 155:19-157:8.)

Here, Mr. Negrete has disclosed information about his medical condition when it serves his needs.  For example, in 2013, in the first of his three bankruptcy filings, Mr. Negrete filed a declaration (which is available to the public) requesting relief because he had been "unexpectedly hospitalized for emergency surgery . . . [and] was under medication that limited [his] ability to work full time."  (Exh. 29.) In 2014, Mr. Negrete used a letter from his physician in the Underlying Litigation to claim that meet-and-confer discussions regarding discovery issues needed to be postponed.  (Exh. 30.)  In 2016, Mr. Negrete again used his medical condition to defend himself when the California State Bar instituted proceedings against him. (Exh. 8 at 25:23-25.)  Further, during his deposition, Mr. Negrete testified that his medical condition may have had something to do with the reason for various malpractice lawsuits filed against him.  (*See, e.g.,* Exh. 19 at 56:6-12.)

Moreover, Mr. Negrete has placed his memory and credibility at issue with his testimony.  Specifically, Mr. Negrete admitted that his testimony "may not be accurate because of the medical care" he was currently undergoing.  (*Id*. at 124:21-125:9.)  This is particularly important because of his claim that he had "vivid" memories when he was making attacks on the character of the NTG Defendants. (*See e.g. id*. at 155:19-157:8.)

"[T]he reliability of [witness's] memory goes to the weight of the evidence." *Clayton v. Eli Lilly and Co*., 421 F.Supp.2d 77, 81 (D.D.C. 2006).  Mr. Negrete's "medicated state and his sometimes uncertain testimony may raise some questions

regarding his credibility.  . . . [which goes] to the weight . . . of his testimony." *Barto v. Armstrong World Indus., Inc*. 923 F. Supp. 1442, 1447 (D.N.M. 1996). Because Mr. Negrete's medical condition and medications are at issue in this litigation, including how they affected his representation of NIC in the Underlying Litigation, and because Mr. Negrete has voluntarily disclosed medical information when it suited his needs, the Court should compel Mr. Negrete to respond to questions regarding his medical condition and medications.

2. ***Mr. Negrete Should Be Required To Provide Responsive, Non-Evasive And Non-Argumentative Answers.***

As previously cited, Mr. Negrete provided evasive and argumentative responses or simply refused to respond to certain questions.  For example, Mr. Negrete repeatedly raised improper objections, such as "the document speaks for itself." (*See e.g.* Exh. 21. at 197:25-198:11.)  At other times, rather than respond to the question, Mr. Negrete used his response as a way to attack the NTG Defendants.  [*See e.g., id*. at 139:20-140:20.)  Mr. Negrete's personal animus towards Scott and Ryan Ferrell does not excuse him of his obligations to provide responses to deposition questions.  Further, Mr. Negrete's attempts to re-frame questions to provide the answers he preferred frustrates a deposition's truth-seeking function.  Mr. Negrete must provide clear, non-evasive answers to deposition questions absent a proper privilege objection.  Because Mr. Negrete failed to do so on numerous occasions, the Court should compel Mr. Negrete to

appear for a second deposition where the Special Master for the Pending Litigation may attend telephonically with the authority to rule on objections and compel Mr. Negrete's deposition testimony.  The Special Master in the Pending Litigation has previously agreed to participate in depositions and is uniquely situated to assess relevance, proportionality and privilege as a result of her knowledge of the issues in the Pending Litigation and the Underlying Litigation.  (Exh. 26 at 3:13-15.)

## C.   <u>Sanctions Are Appropriate.</u>

Pursuant to FRCP 30(d)(1), the Court is required to provide additional time for completing a deposition "if the deponent, another person, or any other circumstance impedes or delays the examination."  During the deposition, Mr. Negrete engaged in disruptive and unwarranted conduct, including improper objections and arguments as well as evasive responses that delayed the ability to proceed with an orderly deposition.  NTG anticipates that the problematic conduct will continue during the reconvened session.  NTG should not be penalized for Mr. Negrete's conduct.  Moreover, in the event the conduct should repeat itself during the second deposition session, it is important that the Special Master have sufficient time to hear argument on any objections or other issues that may arise. For these reasons, NTG respectfully request that it be granted three (3) hours to finish the deposition of Carlos Negrete.

Further, NTG seeks to recover its costs and fees incurred as a result of these motions and the need to reconvene a second deposition session pursuant to Federal

Rules of Civil Procedure 30(d) and 37(a)(5).  Federal Rule of Civil Procedure 30(d)(1) states, "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent."  If a motion to compel responses is granted, FRCP 37(a)(5) states "the court **must**, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  (Emphasis added.)  To the extent the motion to compel is granted in part and denied in part, the Court should "apportion the reasonable expenses for the motion."  *See* Fed. R. Civ. Pro. 37(a)(5)(C).

In light of the conduct described above and the fact that a second session will need to occur, NTG respectfully ask that the Court issue the following sanctions against Carlos Negrete:

- Payment of the cost of the court reporter and videographer for either the first or second session of Mr. Negrete's deposition; and

- Payment of the expenses and attorney's fees that NTG Defendants incurred to bring this motion.

## <u>CONCLUSION</u>

For the reasons set forth above, NTG respectfully requests that the Court issue the following relief:

24

(1)     Order Carlos Negrete to appear for a second session of his deposition to last no longer than three hours;

(2)     Order Carlos Negrete to provide answers regarding his medical condition and medications;

(3)     Order Carlos Negrete to comply with any orders the Special Master may make regarding objections that may be asserted at his second deposition session;

(4)     Order Carlos Negrete to provide his Hotmail email account log-in information to a neutral, third-party computer expert to be agreed upon for the purpose of conducting limited searches that would produce documents responsive to the Document Subpoena; and

(5)     Order Carlos Negrete to pay the reasonable attorneys' fees and costs NTG incurred to bring this motion.

DATED: January 10, 2018

*/s/ Christopher M. Kelly*
Christopher M. Kelly (NC ID No. 24346)
James M. Dedman, IV (NC ID No. 31745)
**GALLIVAN, WHITE & BOYD, P.A.**
6805 Morrison Blvd., Suite 200
Charlotte, NC 28211
(704) 227-1926
(704) 362-4850 FAX
jdedman@gwblawfirm.com

*Local Counsel*

*/s/ Stephanie A. Sperber*
Stephanie A. Sperber (*Pro Hac Vice* Pending)
**CALLAHAN & BLAINE**

25

3 Hutton Centre, 9th Floor
Santa Ana, CA 92707
(714) 241-4444
ssperber@callahan-law.com

*Pro hac vice pending*

*Attorneys for NEWPORT TRIAL GROUP;*
*PC., SCOTT J. FERRELL; RYAN M.*
*FERRELL; VICTORIA C. KNOWLES;*
*DAVID REID and ANDREW LEE BASLOW*

# CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Further, the foregoing was also served on the following parties by regular U.S. Mail, E-mail, and/or Overnight Mail *(Federal Express)* as indicated below:

| | |
|---|---|
| Peter A. Arhangelsky<br>Joshua S. Furman<br>**EMORD & ASSOCIATES, P.C.**<br>3210 S. Gilbert Road, Suite 4<br>Chandler, AZ 85286<br>Phone: (602) 388-8899<br>parhangelsky@emord.com<br>jfurman@emord.com | *Attorneys for Natural Immunogenics Corporation*<br><br>**(Via US Mail)**<br>***Courtesy Copy via Email*** |
| Brendan M. Ford, Esq.<br>Kristopher P. Diulio, Esq.<br>**FORD & DIULIO PC**<br>695 Town Center Drive, Suite 700<br>Costa Mesa, CA 92626<br>Tel: 714-384-5540<br>Fax: 844-437-7201<br>bford@forddiulio.com<br>kdiulio@forddiulio.com | *Attorneys for Non-NTG Defendants: Andrew Nilon, Giovanni Sandoval, Sam Schoonover, Matthew Dronkers, Taylor Demulder,& Samuel Pfleg*<br><br>**(Via Email Only)** |
| Carlos Negrete<br>693 Reems Creek Road<br>Weaverville, NC 28787<br>cfncharlie10@gmail.com | *Non-Party – Pro Se*<br><br>**(Via US Mail)**<br>***Courtesy Copy via Email*** |

This the 10th day of January, 2018.

s/Christopher M. Kelly
Christopher M. Kelly
*Attorney for Defendants/Movants*