Hon. Rosalyn M. Chapman (Ret.)
JAMS
555 West 5th Street, 32nd Floor
Los Angeles, CA 90013
213-253-9776
SPECIAL MASTER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATURAL-IMMUNOGENICS CORP., a Florida corporation, | ) ) |
| Plaintiff, | ) ) Case No: 2:19-mc-00011-JVS-MAA |
| v. | ) ) (JAMS Ref. No: 1220055347) |
| NEWPORT TRIAL GROUP, a California corporation; SCOTT J. FERRELL, a California resident; RYAN M. FERRELL, an Arizona resident; VICTORIA C. KNOWLES, a California resident; DAVID REID, a California resident; ANDREW LEE BASLOW, a California resident; ANDREW NILON, a California resident; SAM PFLEG, a California resident; MATTHEW DRONKERS, a California resident;  TAYLOR DEMULDER, a Nevada resident; SAM SCHOONOVER, a California resident; GIOVANNI SANDOVAL, an Arizona resident; and DOES 1 through 10, inclusive, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ORDER |
| Defendants. | ) ) |

*//*

1

**(1)  ORDER DENYING NEWPORT TRIAL GROUP'S MOTION TO COMPEL RECALLED DEPOSITION OF NON-PARTY CARLOS NEGRETE AND REQUESTS FOR REASONABLE EXPENSES; (2) ORDER GRANTING NATURAL IMMOGENICS' REQUEST FOR REASONABLE EXPENSES OPPOSING MOTION TO COMPEL; AND (3) ORDER DENYING NATURAL IMMOGENICS' REQUEST FOR OTHER ATTORNEY FEES**

On January 10, 2018, in the United States District Court for the Western District of North Carolina (Asheville Division), case no 1:18-mc-00003, Defendant Newport Trial Group ("NTG") filed a motion to compel compliance with Document Subpoena and Deposition Subpoena to non-party Carlos F. Negrete ("Negrete") issued by the District Court for the Central District of California (the "Central District"), with a supporting legal memorandum, the supporting declaration of Stephanie Sperber with numerous exhibits ("Sperber Declaration"), and a request for judicial notice. (W.D. N.C. Dkt. Nos. 1, 3-4).[1]  On January 24, 2018, Negrete filed an opposition to the motion, objections to Sperber Declaration, and his own declaration with several exhibits ("Negrete Declaration" ("Decl.")).  (W.D. N.C. Dkt. Nos. 18-20).  On January 25, 2018, the district court struck Exhibit 20 to Negrete Declaration.  (W.D. N.C. Dkt. No. 21).  On the same date, Defendant NTG filed a notice of errata and revised Sperber Declaration ("revised Sperber Declaration").  (W.D. N.C. Dkt. No. 22).  On January 29, 2018, Negrete filed an amended Exhibit 2 to Negrete Declaration.  (W.D. N.C. Dkt. No. 24).  And on January 31, 2018, Defendant NTG filed a reply to the opposition.  (W.D. N.C. Dkt. No. 26).  On February 2, 2018, Negrete filed a second declaration supporting his opposition to the motion to

---

[1]   The Special Master, pursuant to Fed.R.Evid. 201, takes judicial notice of the docket sheet in *Natural Immunogenics Corp. v. Newport Trial Group, et al.,* Western District of North Carolina, case no. 1:18-mc-00003-MR-WCM.  Documents filed in the Western District of North Carolina will referenced by docket number in that case, as "W.D. N.C. Dkt. No. _".

compel.  (W.D. N.C. Dkt. No. 36).  And on February 28, 2018, Negrete filed a surreply.  (W.D. N.C. Dkt. No. 45).

On April 19, 2018, Magistrate Judge Dennis Howell (the "Magistrate Judge") issued an Order granting, *inter alia*, Defendant NTG's motion to transfer to the Central District the motion to compel compliance with Document Subpoena and Deposition Subpoena issued to Negrete. (W.D. N.C. Dkt. No. 46).  On January 22, 2019, District Judge Martin Reidinger affirmed the transfer of the motion to compel compliance with Deposition Subpoena and overruled the transfer of the motion to compel compliance with Document Subpoena, finding the District Court for the District of South Carolina is the only court with jurisdiction to enforce the subpoena since compliance was in that district.  (W.D. N.C. Dkt. No. 50).  On January 23, 2019, the case and docket sheet were transferred to the Central District, and the case was randomly assigned to District Judge Dolly M. Gee, with the case no. 2:19-mc-00011.[2]   (Dkt. Nos. 56-75). Judge Selna consented to the transfer of the motion to his calendar, finding it relates to the ongoing matter, *Natural Immunogenics Corp. v. Newport Trial Group et cal.*, case no. 8:15-CV-2034-JVS (the "Primary Case").[3]  (Dkt. No. 68).  On February 12, 2019, Judge Selna referred the motion to compel compliance with Deposition Subpoena to the Special Master.  (Dkt. No. 69).

The Special Master, after consulting the parties, established a briefing schedule for the

---

[2]   Unfortunately, not all documents relevant to the motion to compel compliance with the Deposition Subpoena filed in the Western District of North Carolina were transferred to the Central District of California.  Thus, the parties and Special Master continue to refer to documents listed on the docket sheet of the Western District of North Carolina, which is more complete than the docket sheet in this matter, case no. 1:19-mc-00011-JVS.

[3]   Documents filed in the Primary Case will be referred to as PC Dkt. No. _.

parties to file additional memoranda.  Declaration of Joshua Furman ("Furman Declaration" ("Decl.")) ¶ 12. (Dkt. No. 70-1).  NIC filed its Opposition to the motion on May 6, 2019 (Dkt. No. 70), with the supporting Furman Declaration, and NTG timely filed its Reply on May 22, 2019 (Dkt. No. 71), with the supporting declaration of David Darnell and exhibits (Dkt. No. 71-1).

Oral argument was held telephonically on June 27, 2019, before Hon. Rosalyn Chapman, Special Master. Peter A. Arhangelsky ("Arhangelsky") and Joshua Furman ("Furman"), attorneys with the law firm Emord & Associates ("Emord Firm"), appeared on behalf of Plaintiff Natural Immunogenics Corp. ("NIC"); David Darnell, an attorney with the law firm Callahan & Blaine APLC, appeared on behalf of NTG and Scott Ferrell; and Kyle A. Riddles, an attorney with the law firm Bremer Whyte Brown & O'Meara LLP appeared on behalf of Ryan Ferrell, David Reid, Victoria Knowles and Andrew Lee Baslow.  Carlos Negrete did not appear and no appearance was made on behalf of other individual non-NTG Defendants.

## I.  Relevant Procedural History.

The procedural history of the Primary Case is well known to the parties.  Briefly stated, NIC's Second Amended Complaint for Damages and Injunctive Relief ("SAC") against Defendants   raises claims for:   (1) malicious prosecution; (2) violation of Racketeering Influenced and Corrupt Organizations  Act (RICO), 18 U.S.C. §§ 1961, 1962c & 1964, by wire fraud, mail fraud, extortion, obstruction of justice, bribery and witness tampering, against all

defendants;[4] (3) conspiracy to violate RICO, 18 U.S.C. §§ 1961, 1962(d) & 1964(c), against all defendants; and (4) unfair competition in violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. (PC Dkt. 92).  The malicious prosecution claim arises out of NTG's prosecution of *Andrew Nilon v. Natural-Immunogenics Corp.*, 12 CV-0930-LAB-BGSx (S.D. Cal. 2012) (removed from San Diego County Superior Court) ("*Nilon*"), which also was one of four cases allegedly involving a false advertising scheme covered by the RICO claims. Plaintiff NIC seeks compensatory damages, exemplary or punitive damages under California Civil Code section 3294, treble damages under RICO, injunctive relief, an accounting, attorney fees and costs, and other relief.  As to its malicious prosecution claim, Plaintiff NIC represents that its seeks compensatory damages "limited to the recovery of attorney fees and costs it spent in defending *Nilon*…." (PC Dkt. 237).   NIC further represents that the total attorney fees and costs spent to defend *Nilon* was $246,552.52.  (PC Dkt. 258-1 at 39-40).  Of the attorney fees paid to defend *Nilon*, Negrete was paid $25,000 and the Emord Firm was paid $186,341.52. (PC Dkt. No. 612-613).

The Special Master grants NTG's request for judicial notice under Federal Rule of Evidence 201 of Exhibits 3-9 and 29 attached to revised Sperber Declaration, which are public documents filed in:  *Nilon*; Andrew *Nilon v. Natural Immunogenics Corp.*, San Diego County Superior Court, case no. 37-2012-00093325-CU-MT-CTl ("state court *Nilon* action");   *In re Carlos F. Negrete*, Orange County Superior Court, case no. 30-2016-00836353-CU-PT-CJC; *In re Carlos F. Negrete*, State Bar Court of California, case no. 16-TR-13499-DFM; and *In re Carlos F. Negrete*, United States Bankruptcy Court, case no. 8:13-bk-17212-ES.   These

---

[4]  On November 14, 2016, Plaintiff NIC filed a Statement describing its RICO claims.  (PC Dkt. No. 201).

documents show Negrete was retained by NIC on or about 2012 to represent NIC in *Nilon* and the state court *Nilon* action, and he continued to represent NIC in *Nilon* until he was replaced by the Emord Firm on or about February 11, 2015.  Sometime prior to that, on or about December 2014, Negrete stopped communicating with NIC about *Nilon*, which allegedly prevented NIC from becoming aware of court deadlines and Negrete's failures to depose Giovanni Sandoval and experts, and other matters.  After Negrete was substituted out as counsel in *Nilon*, he did not provide NIC with the case file.  Shortly thereafter, *Nilon* was settled.

Starting in mid-2015, the California State Bar ("State Bar") began receiving complaints that Negrete may be incapacitated.  The State Bar investigated, and on February 26, 2016, it petitioned the Orange County Superior Court for permission to assume jurisdiction over Negrete's practice on the grounds he abandoned his law practice without following proper procedures and had relocated to South Carolina.  The Superior Court granted the petition on or about March 2, 2016.  On June 14, 2016, the State Bar involuntarily enrolled Negrete as an inactive member.

## II. Discovery Dispute.

On October 25, 2018, NTG conducted a videographed deposition of Negrete in Ashville, North Carolina.  Revised Sperber Decl., Exh. 21 ("Trans.")  (W.D. N.C. Dkt. No. 3-23).  The deposition commenced at 9:10 a.m. and adjourned at 4:03 p.m., with an hour luncheon recess.  Furman Decl. ¶ 4.  Negrete testified for five hours and sixteen minutes.  Id. ¶ 5.  Sperber conducted the examination of Negrete, who represented himself pro se at the deposition and made his own objections to questions asked of him; Furman represented NIC at the deposition,

and made an occasional objection, as well.

Defendant NTG contends Negrete is a vital witness in the Primary Case since a critical issue is whether NIC's damages in the malicious prosecution claim, which also is a predicate for the RICO claims, are due to Negrete's negligence and malpractice.  (W.D. N.C. Dkt. No. 1-1 at 1-4). NTG seeks an order compelling Negrete to appear for a recalled deposition of three hours since he refused to respond to questions, asserted improper objections, and was evasive and argumentative at his deposition.[5]  (Id. at 9-12, 18-23).  More specifically, NTG seeks to further examine Negrete on questions related to:

(1) "his medical condition and medications" (citing Trans. at 8:10-12; 13:25-14:23; 65:10-66:13);

(2) "conversations he had with Emord [Firm] in anticipation of his deposition" (citing Trans. at 22:20-23:19);

(3) "prior lawsuits that had been filed against him" (citing Trans. at 31:21-46:9; 52:10-25; 53:8-57:19; 66:14-69:13; 71:18-72:8);

(4) "documents based on his objection that the document 'speaks for itself'" (citing Trans. at 33:22-25; 34:12-15; 80:2-9; 81:7-83:3; 166:16-24; 169:18-170:7; 197:25-198:4); and

(5) "often purposely and unnecessarily argumentative" responses (citing Trans. at

---

[5]  NTG's motion, as originally filed in the Western District of North Carolina, included a request to allow a neutral computer expert to conduct a search for documents on Negrete's Hotmail email account.  However, NTG agrees this issue is not before our Court.

139:20-140:20; 145:17-146:11; 148:7-149:12; 174:8-176:6).

(Id.).  NTG argues Negrete has put his medical condition and medications at issue by testifying his practice may have been affected by both in 2013 and 2014 (id. at 19-22), and he should provide clear, responsive (non-evasive and non-argumentative) answers to deposition questions absent a proper privilege object. (Id. at 22-23).   Further, NTG seeks attorney fees and costs (including court reporter and videographer costs) related to the motion to compel a recalled deposition, pursuant to Fed.R.Civ.P. 30(d) and 37(a)(5).

Plaintiff NIC argues it has standing to oppose the motion to compel, and its request for a protective order is timely.  (Dkt. No. 70 at 4, 8-10).  In any event, since the court has an ongoing duty to consider proportionality factors as litigation progresses, a party may seek a protective order as events unfold – especially when circumstances change between the filing of the motion and its determination more than a year later.   Several grounds support the issuance of a protective order.

First, NTG fails to explain how the discovery – the recalled deposition and its proposed areas of examination – are relevant to any claim and defense; NTG has not met its burden to show the relevancy of the questions it proposes for the recalled deposition.  (Id. at 10-11).  There are no allegations in the SAC that Negrete committed malpractice in *Nilon* and questions related to malpractice in *Nilon* and other, unrelated cases is not relevant to the Primary Case.  (Id.).  At the deposition, Negrete was not evasive because he answered the call of each question, although his manner may have been verbose or disjointed.  (Id. at 4, 12-13). Even if Negrete's responses could be considered argumentative, he still answered the questions; grounds do not exist to recall

8

his deposition.  (Id. at 4).

Second, some of the information NTG seeks is privileged.  This information pertains to the content of communications between the Emord Firm, NIC's current counsel, and Negrete, NIC's former counsel, as well as information about Negrete's medical diagnoses and his current medications.  (Id. at 11-14).  Negrete, as NIC's former counsel, can properly raise privilege and work product objections; and he did.  (Id. at 12).  Any discussions between the Emord Firm and Negrete in preparation for Negrete's deposition – if discussing communications about *Nilon* – are privileged.  (Id. at 12-13).  Negrete did not put his health or memory into issue, as NTG asserts; rather, he was merely explaining his answers, and did not waive any protections related to his diagnoses or medications.  (Id. at 13).  In any event, there is ample evidence to evaluate Negrete's credibility without additional information about his diagnoses and medications, which are subject to his right to privacy.  (Id. at 13-14).

Third, the proportionality factors under Rule 26(b)(1) weigh against the motion since the discovery is unlikely to provide any benefit, is not important to resolving the issues in the case, and the costs and burden of the discovery weigh against the motion.  (Id. at 14-19).  There is little benefit to a recalled deposition of Negrete because he has already answered the questions – even when his answers were verbose of contained stream of conscious thought processes or he was being "argumentative" according to NTG, and asking the questions again is unlikely to provide additional information.  (Id. at 15-18).  The objection that "the document speaks for itself" is not necessarily improper when the question asked Negrete to provide a legal opinion.  In any event, the questions to which the objection was made were not  relevant  to the Primary

9

Case.  (Id. at 18).  And the costs and burdens of traveling to North Carolina for a recalled deposition outweigh the benefits of the discovery. (Id. at 18-19).

Alternatively, if any part of the motion is granted, NIC requests the recalled deposition be conducted under Rule 31 with written deposition questions, pursuant to Fed.R.Civ.P. 26(c)(1)(C).  (Id. at 5, 19-21).  Written deposition questions are explicitly provided for when a deponent has already been orally deposed.  Fed.R.Civ.P. 31(a)(2)(A)(ii).  Moreover, since Negrete has testified that he has memory problems, written questions would afford him a better opportunity to refresh his memory and to be more accurate when answering a question than another oral deposition.  And the burden on Negrete and the parties would be less.

Finally, NIC requests reasonable expenses for opposing NTG's meritless motion to compel Negrete's recalled deposition.   Additionally, NIC requests reasonable expenses associated with its successful motion to dismiss NTG's motion to compel compliance with Document Subpoena, filed in the Western District of North Carolina.  (Id. at 21-22).  The district court did not rule on NIC's request for expenses associated with the motion to dismiss and instead transferred all remaining issues to the Central District of California.

In Reply, NTG contends NIC's request for a protective order is untimely and should have been brought when Deposition Subpoena was served.  (Dkt. No. 71 at 9-12).  There is no merit to NIC's claims that the recalled deposition seeks irrelevant information (id. at 12-18) and is not proportional. (Id. at 18-23).   Written deposition questions under Rule 31 would not be appropriate because the jury needs to see a live witness, and would probably spawn more

litigation.   (Id. at 23).   NIC's request for expenses associated with the Document Subpoena should be denied on two grounds:   (1) the Western District of North Carolina could have awarded NIC fees and it did not; thus, the court inferentially denied the request (id. at 24); and (2) fees under Rule 37 are not proper because the Western District of North Carolina ruled on a motion to dismiss, not a motion under Rule 37. (Id. at 24-25).

## DISCUSSION

### III.  Legal Standards.

"Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also see also Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) ("Broad discretion is vested in the trial court to permit or deny discovery…." (internal quotations and citations omitted)); *Schism v. United States*, 316 F.3d 1259, 1300 (Fed. Cir. 2002) ("A trial court has wide discretion in setting the limits of discovery." (internal quotation marks and citation omitted).)

Rule 30 provides when oral depositions may be taken with and without leave of court: "A party may, by oral questions, depose any person, including a party, without leave of court…."; however, "[a] party must obtain leave of court, and the court must grant leave to the extent *consistent with Rule 26(b)(1) and (2) ... if* the parties have not stipulated to the deposition and *...  the deponent has already been deposed in the case*…." Fed.R.Civ.P. 30(a)(1), (2)(A) (emphasis added).   Rule 37(a) provides that a party may move to compel an answer to a deposition question when "a deponent fails to answer a question asked under Rule 30…."

Fed.R.Civ.P. 37(a)(3)(B)(i).  For purposes of Rule 37(a), "an evasive or incomplete … answer … must be treated as a failure to … answer…." Fed.R.Civ.P. 30(a)(4).

As the Special Master has previously noted, Rule 26(b)(1) of the Rules of Civil Procedure provides: "Parties may obtain discovery regarding any *non-privileged matter that is relevant* to any party's claim or defense and *proportional to the needs of the case*, considering [1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed.R.Civ.P. 26(b)(1) (emphasis added).  In other words, "[i]nformation is discoverable under the revised Rule 26(b)(1) if it is relevant to any party's claim or defense *and* is proportional to the needs of the case." *Advis. Comm. Notes to the 2015 Amendment to Rule 26* (emphasis added).  "The present amendment restores the proportionality factors to their original place in defining the scope of discovery.  This change reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections." *Id.*

Some courts have concluded that "the 2015 amendments to Rule 26 do not alter the burdens imposed on the party resisting discovery….  Rather, just as was the case before the December 1, 2015 amendments, under Rules 26(b)(1) and 26(b)(2)(C)(iii), a court can – and must – limit discovery that it determines is not proportional to the needs of the case," considering the multiple factors set forth above. *McKinney/Pearl Restaurant Partners, LP v. Metro. Life Ins.*

*Co.*, 322 F.R.D. 235, 243 (N.D. Tex. Jan. 8, 2016).  Other courts have characterized Rule 26(b) slightly differently, concluding "the trial court must apply a balancing of interests approach to the Rule[:] … Under the balancing standard, the district judge must compare the hardship to the party against whom discovery is sought against the probative value of the information to the other party.  Courts also weigh relevant public interests in this analysis." *United Parcel Serv. Co. v. DNJ Logistic Group, Inc.*, 2018 WL 3199475, at \*10 (W.D. Ky. 2018) (citations and internal quotation marks omitted).

Regardless of the approach, it is clear that "[t]he 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.  The fundamental principle of amended Rule 26(b)(1) is that lawyers must size and shape their discovery requests to the requisites of a case." *Roberts v. Clark Cnty. Sch. Dist.*, 312 F.R.D. 594, 603 (D. Nev. 2016) (citations omitted).  Taking into consideration all of the factors listed in Rule 26(b)(1) and (b)(2)(C), the ultimate question under the Rule is "whether the burden … of the proposed discovery outweighs its likely benefit." Fed.R.Civ.P. 26(b)(1), 26(b)(2)(C)(iii).

Additionally, Rule 26(b)(2) *requires* restrictions or limitations to discovery in certain circumstances:  "*On motion or on its own*, the court *must* limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:  (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, and less expensive; (ii)  the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii)  the burden or

expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  Fed.R.Civ.P. 26(b)(2)(C) (emphasis added).

## IV. Analysis.

### a. Rule 26(b)(1)

Negrete's deposition testimony, as NIC's former counsel, is relevant to the parties' claims and defenses in the Primary Case, as the Special Master has previously found.  *See, e.g.*, PC Dkt. No. 298 at 15-17 ("Examination of Plaintiff's counsel [Arhangelsky and Furman] about the *Nilon* case is relevant to Plaintiff's claim for compensatory damages (attorney fees and costs incurred in defending the *Nilon* action); id. ("NIC has impliedly waived the attorney-client privilege and work product protection pertaining to defense costs and delay in resolving the *Nilon* case….).  This ruling is the law of the case.  *Kimberlin v. Quinllan*, 199 F.3d 496, 500 (D.C. Cir. 1999) ("The law-of-the-case doctrine rests on a simple premise:  'the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*.'" (emphasis in original) (citation omitted)).  As matter of law, Negrete's deposition is relevant to discovery relating to NIC's claim for compensatory damages, which relies on NIC's defense costs and delay, if any, in resolving *Nilon*.  The deposition is not for the purpose of obtaining information relating to Negrete's negligence or malpractice as counsel in the *Nilon* action (or other cases), which has limited relevancy to the Primary Case.

Although Negrete's deposition is relevant, as a matter of law, that determination does not

end our relevancy inquiry under Rule 26(b)(1).   To prevail on its motion to compel Negrete's recalled deposition, NTG must, first, show that Negrete "fail[ed] to answer" a question at his deposition, Fed.R.Civ.P. 30(d)(a)(2)(A), and, second, must show that the question is relevant and non-privileged, within the meaning of Rule 26(b)(1).    As discussed below, Negrete *did* answer questions in two of the five areas of examination NTG proposes for the recalled deposition; two of the areas of proposed examination relate solely to Negrete's credibility and, thus, have limited relevancy; two of the proposed areas of examination could present thorny privilege issues; and one area of examination is not relevant to the Primary Case.   Moreover, to a substantial extent, NTG's deposition examination of Negrete did not focus on his representation of NIC in the *Nilon* action, but merely challenged his credibility or veracity.

(1) <u>medical condition and medications</u>

 NTG moves to compel Negrete to answer questions at a recalled deposition related to his medical conditions and the medications he takes.  From the very start of the deposition, Negrete warned counsel that he was "taking some medication and …ha[d] some health conditions that *could* affect [his] memory, either short term or long term.  (Trans. at 7:22-24 (emphasis added)). In its motion, NTG highlights the following instances when Negrete would not respond to questions about his health or medications:

- Trans. at 8:10-22 (emphasis added)   --

  Q  Okay.  You indicated that you are currently on some medications that may affect your memory, is that correct?

  A  *May.*

Q  What medications are those?

A  That's -- *objection.*

Q Mr. Negrete, to the extent that you are putting memory issues at play, I'm going to insist on asking you what medications they are so I can access whether or not they actually may have an impact on your memory.

A  I disagree with your position and *it's HIPPA protected, so I object.*

- Trans. at 13:25-14:23 (emphasis added) --

    Q  Okay.  Mr. Negrete, you indicated a few times now that you have some medical conditions that *may* affect you testimony.  What are those medical conditions?

    A  *Yeah, I object.*

    Q  Mr. Negrete, … I would encourage you to answer the question so that we're not forced to come back.

    A  …  Now keep in mind what I want to point out to you because I want to have full disclosure, both my conditions and medications *could* affect my memory, *could* affect short term, *could* affect long term.  It's very random.  I *could* forget your name or who you are, but I could remember 40 years ago with extreme precision.  *I'm going to do the best I can.*

- Trans. at 64:10-66:13  (emphasis added)  --

    Q  And your perception that sanctions are common in California is based on what exactly?

    A  30 years of practice.

16

…

Q   Mr. Negrete, my initial question was whether you have had sanctions issued against you and you said, "I think I have."

A  Yes.

Q  Do you think you have or are you positive that you have?

A  Positive, not for the reasons I've stated before.  *Think I have, I think I have.*

Q  To be clear, you can't be positive because of your medical issues?

A  *True.*

Q   And/or your --  and/or your medication?

A  *True.*

…

Q  Mr. Negrete, to the extent that I ask a question and you have an objection, you can state it….

A.  Right, but if you ask the same question over and I've stated an objection, I'm noting the objection again.

Q  And that objection was?

A  *Privacy, HIPPA and relevance.*


   The issue of Negrete's medical conditions and the medications he takes relates solely to the credibility of Negrete's testimony that he has short-term and long-term memory issues that *may* affect his testimony.  This is certainly tangential to the claims and defenses in the Primary Case. And despite advising counsel of his *possible* memory problems, Negrete said he would "do the best" he could to answer the questions asked of him.  In fact, NTG does not highlight any

questions relevant to the Primary Case that Negrete could not answer due to his memory problems.  And several of the areas of examination to which Negrete had no memory have no relevancy to the claims and defenses in the Primary Case, including whether he was sanctioned when he was a practicing attorney for more than 30 years.  (Even Negrete had the presence of mind to object to that line of questioning on relevancy grounds!)

Further, NTG possesses substantial evidence to determine Negrete's credibility about memory problems, including *inter alia* the Orange County, State Bar and Bankruptcy Court documents.  If the purpose for examining Negrete about his medical conditions and the medications he takes was not to attack his credibility, but to show Negrete was negligent or committed malpractice in *Nilon*, that issue is not relevant to the parties' claims and defenses; rather, the deposition of Negrete, as NIC's counsel, was to focus on NIC's damages.  For this reason alone, NTG's proposed questions are not relevant within the meaning of Rule 26(b)(1). *See, e.g., Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) ("District courts have broad discretion in determining relevancy for discovery purposes.").

Moreover, questions about Negrete's health and the medications he takes could invade Negrete's privacy rights.  In this regard, NTG's contention that Negrete – a non-party – waived his right to privacy by placing his mental state "in issue" by explaining he may not be able to remember some things is not well-taken; NTG cites no authority for this incredibly broad proposition.  Considering the parties' history of litigating each and every minor disagreement in the Primary Case, to allow these questions would undoubtedly expand our discovery disputes to include issues related to Negrete's privacy rights and whether he has waived those rights.

Clearly, such an expansion is not proportional to the needs of the case, as discussed further below.

(2)  conversations with Emord Firm in anticipation of his deposition

NTG moves to compel Negrete to answer questions at a recalled deposition related to his conversations with NIC's current counsel at the Emord Firm in anticipation of deposition, citing Trans. at 22:20-23:19 as the basis for this request. The Transcript shows the following colloquy between Sperber and Negrete:

> Q  … did you talk about the content or anticipated content of your deposition today?
>
> A  *Objection, privilege, work product.*
>
> Q  Mr. Negrete, the question is a yes or no question. It's not calling for privileged information, so I'm –
>
> A  *Yes.*
>
> Q  I'm going to ask the question again.  During your conversations with Mr. Furman or Mr. Arhangelsky, did you discuss the content or anticipated content of your deposition today?
>
> A.  Whether you state it's a question that requires a yes or no answer, objection, improper as to form, still could contain privilege.  Doesn't change it – whether you repeat the question several times doesn't change it.  You have my objection.
>
> Q  Mr. Negrete, we'll try this one more time.  Yes or no, during your conversation with Mr. Furman or Mr. Arhangelsky, did you at any point discuss the content or

anticipated content of your deposition today?

A *Objection, responded to, harassment.*

(emphasis added).

Prior to this exchange, Negrete answered a series of questions about his conversations with NIC's counsel at the Emord Firm:

- Trans. at 16:5:-17:2  (emphasis added)  --

  Q:  Prior to today, have you spoken with any of NIC's current attorneys regarding this case?

  A  Do you mean Mr. Furman or any attorney?

  Q  Any of NIC's attorneys, Mr. Furman, Mr. Arhangelsky, anybody at the Emord Firm or anybody else that represents NIC.

  A  *I believe I talked to Mr. Furman.  I may have talked to other counsel.*  I don't know all the paralegals or all the attorneys in this case.

  Q Okay.  So you believe you may have talked to Mr. Furman about this case prior to today?

  A  *I believe I talked to Mr. Furman about this deposition –*

  …

  Q  And how long did that conversation last?

  A   A minute or two.

  Q  And what was the purpose of that call?

  A  Making sure we're both going to be here.

Q  Was there anything else discussed during that call?

A.  No.


- Trans. at 17:3-9  (emphasis added)  –

Q   Have you had other any other conversations with Mr. Furman besides that call?

A *There may have been one or two others, maybe more, under five, all involving scheduling.*

Q  All involving scheduling relating to the deposition for yourself?

A  as – *yes.*


- Trans. at 17:10-18:3   (emphasis added)  –

Q  Okay.  Have you had any conversations with Peter Arhangelsky, an attorney at Emord that currently represents NIC?

…

A  Oh similar.  I remember – *I have a memory of a conversation.*

Q:  How long ago do you think that conversation was/

A  Weeks if not months.

Q  And what was the nature of that conversation?

A *Same, similar.*

Q  Discussing your deposition, discussion you deposition?

A  *Yes.*  No, let me preface by saying we have a joint counsel *privilege* and, so, any substantive client information or work product, I'd object.

- Trans. at 19:25-20:5 (emphasis added) --

    Q  Mr. Negrete, did – during your conversations with either Mr. Arhangelsky or with Mr. Furman, did you discuss the content or anticipated content of your deposition today?

    A  Objection. *I don't believe so.*

The Transcript shows that Negrete *did* answer a series of questions about conversations with NIC's counsel, including the very question NTG now seeks to compel him to answer at the recalled deposition.  For this reason alone, NTG's motion should be denied as cumulative and duplicative within the meaning of Rule 26(b)(2).  If the purpose of these questions and any follow-up questions would be to challenge Negrete's testimony on the ground he was "coached" by NIC's counsel, who prepared him for the deposition, the questions once again relate to Negrete's credibility.   As discussed above, the issue of Negrete's credibility has limited, tangential relevancy to the claims and defenses in the Primary Case. And NTG already has considerable information related to Negrete's credibility.

Although NTG does not identify any follow-up questions it might ask Negrete, follow-up questions related to the *content* or *substance* of the conversations with NIC's counsel could intrude on NIC's attorney-client privilege.  *See, e.g., Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996) (holding the attorney-client privilege belongs to the client – not the attorney).   Negrete, as NIC's attorney in *Nilon*, may have a duty to invoke attorney-client privilege on NIC's behalf to protect privileged information he obtained as NIC's counsel which

he may have discussed with NIC's current counsel; NIC has not waived its attorney-client privilege for all purposes, but only as it relates to NIC's claim for damages.  Once again, there is no reason to expand our discovery disputes to include issues related to Negrete's assertion of the attorney-client privilege.  Clearly such expansion is not proportional to the needs of the case, as discussed further below.

   (3)  prior lawsuits filed against him

   NTG moves to compel Negrete to answer questions at a recalled deposition relating to prior malpractice lawsuits against him.  However, the Transcript shows Negrete *did* answer questions about at least two malpractice suits against him,[6] although such questions are not relevant to the claims and defenses in the Primary Case, as determined above.  Moreover, it is clear that NTG has considerable documentary evidence related to malpractice lawsuits against Negrete; thus, assuming *arguendo* these questions are relevant, examination of Negrete on litigation against him or documents pertaining to malpractice suits against him (as discussed below) would be cumulative or duplicative within the meaning of Rule 26(b)(2).

   (4)  documents based on his objection that the document "speaks for itself"

   NTG moves to compel Negrete to answer questions at a recalled deposition relating to

---

[6]  See Trans. at 45:11-21 (emphasis added):
   Q  … The question is do you recall anything about this legal malpractice lawsuit that's been marked as Exhibit 185?
   A  *Some.*
   Q  What do you remember?
   A  *I remember there was a lawsuit.  I remember there were some claims relating to that lawsuit concerning the statute of limitations.  I also remember it was disposed of in the bankruptcy and by settlement.*
Also see footnote 7.

documents to which he objected on the ground that the document "speaks for itself."  The Special Master assumes *arguendo*, without deciding, that Negrete's objections to the questions were improper.  Making an improper objection to an irrelevant question, however, is not a basis for recalling a deponent.

Reviewing the instances where Negrete objected to a document on the ground that  "it speaks for itself," the Special Master notes that the documents were:  a complaint filed against Negrete in a malpractice case (Trans. at 33:13-25, 34:3-15);[7] Document Subpoena to Negrete (Trans. at 80:2-13, 81:7-83:3); and miscellaneous documents (Trans. at 166:16-24, 169:18-170:7, 197:25-198:4).  Although NTG discusses the impropriety of Negrete's objections, it does ***not*** explain the relevancy of any of the questions about the documents to the Primary Case.  In fact, NTG does not highlight any particular document or explain its importance.[8]  Without any explanation of the relevancy of each of the documents to which Negrete may have imposed an improper objection, NTG has not met its burden to show grounds exist to recall Negrete.  The improper refusal of a deponent to answer a question that may not be relevant cannot be a ground

_____

7    The Special Master has concluded questions about malpractice cases against Mr. Negrete are not relevant to the claims and defenses in the Primary Case, as discussed above.  Moreover, the Transcript shows Negrete did answer the irrelevant question, to some extent.  *See* Trans. at 33:9-25 (emphasis added):
> Q  Do you recognize this as a complaint for malpractice that was filed in California state court [Exhibit 184] ?
> A  *Yeah, this is a dismissed complaint.*
> Q  Mr. Negrete, my question was do you recognize this as a complaint for legal malpractice that was filed in California state court?
> A  *Yeah*, I just answered the question.  It refreshes my recollection, *it's a case that was dismissed.*
> Q  Do you recall what the basis of this legal malpractice lawsuit was?
> A  Well, the complaint speaks for itself.  I'm not here to testify as to an opinion.

8    The Special Master was not provided with all of the Exhibits to Negrete's Transcript.  Nevertheless, any complaint in a malpractice case against Negrete is not relevant for the reasons discussed above.  Additionally, compliance with the Document Subpoena, which the Special Master does have, is not properly before the Court and questions relating to the Document Subpoena are a round-about way of addressing Negrete's lack of compliance.

to recall the deponent.  Certainly, recalling the deponent to answer an irrelevant question is not

proportional to the needs of the case.  Here, NTG has not met its burden to show the relevancy of

its questions about the documents.


   (5)  <u>purposely and unnecessarily argumentative responses</u>

   NTG moves to compel Negrete's recalled deposition on the grounds he was purposely

and unnecessarily argumentative.  There is no doubt Negrete sparred with Sperber and, at times,

appeared to be arguing with her.  Certainly, there was no joy in deposing Negrete.  His behavior

as a deponent was far from acceptable -- especially considering he is a lawyer, who should know

better.  Nevertheless, a review of the instances NTG cites to support this ground for recalling

Negrete shows that Negrete did, in fact, answer the questions asked --  except for one question,

to which he stated he was having memory problems:


- Trans. at 139:20-140:20  (emphasis added) --

  Q  Mr. Negrete, have you seen this document that's been marked as Exhibit 81

  before?

  A  *I believe I have.*

  Q  Has it been quite some time?

  A  Yes.

  Q   Do you recognize this as the complaint that was filed against [NIC} by

  Andrew Nilon?

  A  You know, having a little difficulty, maybe you can help me out.  Is Andrew

  Nilon the fake client, is he the fake guy?  I'm trying to get this straight.  There

was somebody else that came in later and I know Andrew Nilon, I think was the fraud, but I'm not quite sure.  If it's his or if the – the original complaint, then it's probably the guy.  When I say the original complaint by [NTG].

Q  Mr. Negrete, do you recognize this as the original complaint that was filed against [NIC]?

A.  Okay.  My recollection and my memory of this is there were an – there was an action brought originally by a guy turned out to be a phony.  I believe that's Natural – Andrew Nilon.  If that's the one that started the cases with [NTG], the, *yes, I believe this is the one.*

- Trans. at 145:17-147:14 (emphasis added)

Q  Mr. Negrete, I just handed you –

A  Wow, that's familiar.

Q  -- what's been marked as Exhibit 262.  Is Exhibit 262 a declaration that you filed on or about June 30th of 2014?

A  I don't remember whether this was with the phony Nilon or Sandoval.  I'm getting confused.  Let's look at the  -- no, date's not going to help me much.

Q  My question was is this a declaration that you filed on or about June 30th of 2014?

A  *Yeah….*

…

Q  In paragraph 4, you stated in you declaration under penalty of perjury that, "Since early April 2013, NIC has been attempting to schedule the deposition of

26

the Plaintiff Nilon." Do you see that?

A  Yeah.

Q  Is it fair to stay that that was a true and accurate statement when you filed this declaration?

A  Not sure about the dates, but *kind of remember the events. Remember the events. Seems like a true statement.*

Q  Is there any reason to believe that the statement that you wrote in this declaration and signed under penalty of perjury might have been false?

A  Other than my memory, no.

Q  Okay, but is it fair to assume, then, that if you put it into a declaration and signed it, that it was true?

A  It looks like it's filed.  *Looks like my electronic signature.  I would believe it would be true.*


- Trans. at 148:7-149:18 (emphasis added) --

    Q  And this email is requesting dates for the depositions of Dr. Willis and the Plaintiff?

    …

    A *I'm trying to refresh my recollection* and I asked a legitimate question.  I don't know whether this is Nilon or Sandoval; one was phony.  It thing it was Nilon just because the dates – we go – well, you got 4/10 and this is –

    Q  Mr. Negrete, is there some reason why you're having problems answering the question as phrased?

27

A *Yeah, memory.*

Q Mr. – Mr. Negrete, I'm not asking you which Plaintiff it was, I'm just asking whether or not you're trying to take the deposition of the Plaintiff.

A That's what I'm saying, I'm answering your question. There's two Plaintiffs – well, there's more. There's the class, there's Andrew Nilon and I forgot what his name was, Sandoval, it was substituted once we found out we couldn't get a deposition, the Ferrells were lying, so –

Q So, to be clear, there was one Plaintiff Andrew Nilon and then there was another Plaintiff –

A true.

Q – Giovanni Sandoval, but there was never two Plaintiffs at the same time correct?

A No, that's not correct, it's a class.


- Trans. at 175:1-176:6 (emphasis added) --

Q Mr. Negrete, my question was whether Andrew Nilon's deposition was scheduled for May 3rd when Ryan Ferrell sent this email to you on April 24th.

A I thought I answered the question. Objection, asked and answered. In this case, particularly – well, not this case, any case with [NTG], it's a matter of perception. My perception is I had a trial date – well, excuse me, a deposition date set and scheduled. I believe in Ryan's perception and Ryan's acts he was lying. There was no belief that it was going to be set on a certain day, it was never going to happen, we weren't going to have Andrew – Andrew Nilon's

28

deposition.

Q  Mr. Negrete, … I'm asking you a question based on facts and documents.

A  And I'm giving you that.

Q    Okay.  So my question to you, and perhaps you want to refresh your recollection by looking at Exhibit 82 –

A  Okay.

Q – my question is was Andrew Nilon's deposition scheduled for May 2, 2013 when Ryan Ferrell sent you this email?

A  Well, I show the notice as May 3d.

Q  I'm sorry, May 3, 2013.

A  *From our office's standpoint, from me, yes, that's the date it was scheduled.*

All in all, NTG has not met its burden to show Negrete failed to answer the questions it seeks to have him answer on recall.

b.  *Proportionality*

As the District Court notes, "determinations as to proportionality are subject to change with the circumstances."  (PC Dkt. No. 788 at 11).   The circumstances, here, include the facts that on October 25, 2017, Negrete was examined by NTG's counsel for five hours and sixteen minutes (out of 7 hours); and at the end of the deposition, NTG's counsel stated she had no further questions (Trans. at 259:22), but anticipated filing a motion to compel with regard to the Document Subpoena. (Id. at 260:22-24)  More than half of the questions propounded to Negrete did not relate to his representation of NIC in *Nilon* and were not relevant to the claims and

defenses of the Primary Case.  The examination of Negrete on the *Nilon* matter did not commence until page 136 of the 270-page Transcript.  And a review of Negrete's testimony starting at page 136 shows Negrete answered questions related to the *Nilon* action, which undercuts the benefit of recalling Negrete for examination on questions related to his credibility and documents, the relevancy of which has not been established.  This is especially true in light of the potential privilege issues.

This conclusion is supported by consideration of the six factors set forth in Rule 26(b)(1). First, although the malicious prosecution claim is important in itself, and as part of the RICO claims, Negrete's deposition was primarily relevant to the issue of the compensatory damages NIC seeks in the Primary Case.  Second, the amount of damages is not really in dispute, as the District Court notes.  *See* PC Dkt. No. 788 at 13 ("[T]he amount in controversy here is more than $234,966.52 [the amount of compensatory damages].  Treble damages under the civil RICO statute bring the amount in controversy to $704,899.56, and … punitive damages are available for NIC's malicious prosecution claim.  The civil RICO statute also provides for the mandatory recovery of attorneys fees and costs.  However, the Court finds that the amount in controversy is not so high as to validate unending discovery…").  Third, NTG has conducted substantial discovery to date and, *inter alia*, now possesses all documents filed in *Nilon*, the state court *Nilon* action, the other seven actions underlying the RICO claims, and numerous other documents related to Negrete's practice of law and his alleged incapacity at the time he represented NIC *Nilon*, including Orange County, State Bar and Bankruptcy documents.  Fourth, the parties' resources appear to be never-ending, which is a neutral factor.

Fifth, and most significantly, the discovery at issue is not important to resolving the issues in the Primary Case; rather, most of the discovery addresses Negrete's credibility. Sixth, NTG has not met its burden to show that the expense of Negrete's recalled deposition outweighs its likely benefit. Fed.R.Civ.P. 26(b)(1). As found above, the discovery at issue is not important to resolving the issues or claims and defenses in the Primary Case. And it is not disputed that recalling Negrete's deposition in North Carolina will be costly for the parties, including travel time and costs, hotels, rental cars, and the like. Furman Decl. ¶ 6. Those expenses do not include the additional Court time and expense that would undoubtedly be required to address new discovery disputes related to any recalled deposition, including the privilege and privacy issues discussed above. Further, NTG has not shown, and cannot show, that it will be prejudiced by the denial of its motion to compel Negrete's recalled deposition.

For these reasons, granting NTG's motion to compel Negrete's recalled deposition is not proportional to the needs of the case, within the meaning of Rule 26(b)(1) . *See, e.g.,* PC Dkt. No. 788 at 13 ("The burdens imposed by this litigation are not justified by the amount in controversy."); *Nation Star Mortgage LLC v. Flamingo Trails No. 7 Landscape Maintenance Ass'n*, 316 F.R.D. 327, 331 (D. Nev. 2016) ("The recent amendments to the discovery rules [adding proportionality] are meant to curb the culture of scorched earth litigation tactics by emphasizing the importance of ensuring that the discovery proves provides parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery." (internal quotations and brackets omitted) (citation omitted).) Thus, NIC's motion to compel the recalled deposition of Carlos Negrete is denied.

### b.  Protective Order

The denial of NTG's motion to compel Negrete's recalled deposition renders moot NTG's claims that NIC lacks standing to seek a protective order and that NIC's request for a protective order is untimely.  *See, e.g., Chafin v. Chafin*, 588 U.S. 165, 172 (2013) ("Federal courts may not 'decide questions that cannot affect the rights of litigants in the cases before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" (citation and internal quotation marks omitted)); *Mills v. Green*, 159 U.S. 651, 653 (1895) ("The duty of this court, and of every other judicial tribunal, is … not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.").  It also renders moot NIC's request that, in the event the motion to compel is granted, Negrete's deposition should be conducted under Rule 31, rather than an oral deposition under Rule 30.

### V.  Attorney Fees.

Plaintiff NIC and Defendant NTG make cross-requests for attorney fees under Rule 37(a).[9]  When a discovery motion is denied, Rule 37(a) provides that the court may "require the movant, the attorney filing the motion, or both to pay the party … who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees.  But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust."  Fed.R.Civ.P. 35(a)(5)(B).

---

[9]   Defendant NTG's request for attorney fees under Rule 30(d)(2) is moot in light of the denial of the motion to compel Negrete's recalled deposition.

Defendant NTG's motion to compel Negrete's recalled deposition is not substantially justified within the meaning of Rule 37(a)(5)(B), for the reasons set forth above in the Analysis. The Special Master also concludes there are no "other circumstances" that would make an award of expenses unjust.  In this regard, the Special Master considered whether Negrete's behavior during the deposition, including his stream-of-consciousness manner of answering questions, his raising privacy and attorney-client privilege objections, and his generally combative attitude, could reasonably be considered "other circumstances" that would make an award unjust, and determined they are not.

NTG's counsel are experienced and sophisticated trial lawyers who reasonably should have known there were no grounds to compel Negrete's recalled deposition.   Under the camouflage of his manner and attitude, Negrete did answer many of the questions asked of him, especially questions related to the *Nilon* action or questions that were not directed toward his general competence as an attorney.   As a non-party representing himself at the deposition, Negrete could reasonably raise a privacy objection to a question that appeared to intrude on his privacy.  Similarly, as NIC's former counsel, Negrete has a continuing duty to protect privileged information he obtained while representing NIC and could reasonably raise an attorney-client privilege objection to a question that appeared to intrude on privilege.   Although the Special Master does not approve of Negrete's conduct, as noted above, and fully understands the difficulties NTG's counsel encountered during the deposition, the circumstances of the deposition do not constitute "other circumstances" that make an award of expenses unjust within the meaning of Rule 37(a)(5)(B).   Thus, NIC's request for reasonable expenses related to the motion to compel Negrette's recalled deposition is granted.   NTG will be ordered to pay NIC's

reasonable expenses; not NTG's counsel or both.

NIC also seeks attorney fees under Rule 37 related to the dismissal by the Western District of North Carolina of the portion of NTG's original motion to compel related to compliance with Document Subpoena under Rule 45 to Negrete.  NIC argues that although it had requested attorney fees in its motion to dismiss, which was granted, the district court did not rule on its request; rather, the request was transferred to this district court along with the pending motion to compel Negrete's recalled deposition.  NIC argues it is entitled to attorney fees because NTG's legal position was not substantially justified; NTG was well-aware the only court with jurisdiction to compel compliance with Document Subpoena was the District of South Carolina,  not the Western District of North Carolina.   On the other hand, NTG argues that NIC's motion to dismiss was not under Rule 37 and, thus, NIC cannot move for attorney fees under Rule 37.

The District Court for the Western District of North Carolina, in reviewing the Magistrate Judge's Order relating to NTG's Document Subpoena held:

> [T]his Court lacks authority under Rule 45(f) to transfer any motion seeking to compel compliance with the Document Subpoena.  Accordingly, the Court will vacate that portion of the Magistrate Judge's Order transferring the Motion to Compel insofar as it relates to the Document Subpoena.  Moreover, to the extent that NTG's Motion to Compel seeks to compel compliance with the Document Subpoena, such motion *is denied without prejudice*.

W.D. N.C. Dkt. No. 55 at 7 (emphasis added) (citation omitted). This Order is not an unequivocal victory for NIC, as NIC suggests. Rather, a denial without prejudice is not an outright denial; NTG could have brought the motion to compel Document Subpoena in the proper district court. Accordingly, the Special Master denies NIC's request for attorney fees associated with the Western District of North Carolina's ruling on the motion to compel compliance with Document Subpoena.

## ORDER

1.    Newport Trial Group Defendants' motion to compel the recalled deposition of Carolos Negrete is denied.

2.  Newport Trial Group Defendants' motion for reasonable expenses is denied.

3.  Natural-Immunogenics Corp.'s motion for reasonable expenses related to the motion to compel Negrete's recalled deposition is granted, pursuant to Rule 37(a)(5)(B), and NTG shall pay NIC its reasonable expenses.

The parties shall brief *the amount of damages* as follows:

NIC shall file a short memorandum, with supporting declaration(s), no later than ten days from the date of the Order;

NTG may file an opposition, if any, and opposing declaration(s), if any, no later than ten days from the filing of NIC's memorandum; and

NIC may file a reply, if any, no later than ten days from the filing of NIC's

opposition.

4.  Natural-Immunogenics Corp.'s motion for reasonable expenses related to the motion to compel compliance with Document Subpoena is denied.

5. The Case Manager shall serve this Order on the parties and the District Court.

Date:  June 27, 2019                    By: _____
1220053347.63B                          Hon. Rosalyn Chapman (Ret.)
                                        Special Master